UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | Case No. 22-cr-358 (RC) |
| v. : | |
| : | |
| KATELYN BARTOW and : | |
| TRAVIS BARTOW, : | |
| : | |
| **Defendants.** : | |

**GOVERNMENT'S CONSOLIDATED SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Katelyn Bartow to 30 days' incarceration and Defendant Travis Bartow to 21 days' incarceration, and order that each defendant pay $500 restitution.

**I.     Introduction**

Katelyn Bartow, a 30-year-old ranch manager, and her brother Travis Bartow, a 32-year-old superintendent of a construction company, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9

1

Both defendants pleaded guilty to a violation 40 U.S.C. § 5104(e)(2)(G). As explained herein, a sentence of incarceration is appropriate in this case because both defendants (1) were among the first group of rioters to reach the Northwest Terrace; (2) rallied other rioters who were hesitant to move forward; (3) helped other rioters scale a wall leading up to the terrace; (4) entered the Capitol through the Senate Wing Door approximately ten minutes after its initial breach; (5) "organized" rioters in the Capitol Visitor Center; and (6) lied to the FBI when interviewed. Katelyn Bartow warrants a higher sentence because she celebrated the riot on social media.

The Court must also consider that the defendants' conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for their actions alongside so many others, the riot likely would have failed. Here, the facts and circumstances of their crimes support a sentence of 30 days' incarceration for Katelyn Bartow and 21 days' incarceration for Travis Bartow.

## II.  Factual and Procedural Background

*The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol in the statement of offense. *See* ECF Nos. 42, 48 at 1-3.

*Defendants Bartows' Role in the January 6, 2021 Attack on the Capitol*

On January 5, 2021, Katelyn and Travis Bartow (hereinafter "the Bartows") traveled to Washington, D.C. with several of their family members. The following day, the family attended former President Trump's rally on the Ellipse and marched to the Capitol afterwards. Once near

---

million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

the Capitol, the Bartows separated from their family and moved into a crowd of demonstrators on the West Front of the Capitol. After rioters breached the police line in front of the stairs leading to the Northwest Terrace, the Bartows followed the rioters up the stairs. Once they reached the top of the stairs, Katelyn climbed on top of a wall adjacent to the stairs and began to cheer other rioters forward. Figure 1. In a minute-long video recorded by Katelyn at this time, she is heard yelling, among other things, "let's go" at the rioters on the steps and encouraging them to "keep moving." Gov't Ex. 2. At the same time, Travis stood at the top of the stairs while clapping and patting other rioters on their backs as they ascended the stairs. *Id.*; Figure 1. In a voice message Katelyn later sent through her Facebook account, she said she encouraged these rioters because they were "hesitant" to be there. The Bartows then moved north along the terrace wall where they helped people finish scaling the wall up to the terrace. Figure 2.



*Figure 1: Katelyn (circled in red) cheering rioters and waving her hat around. Travis (circled in yellow) is also encouraging rioters up the stairs. Gov't Ex. 1 at 0:07.*

3


*Figure 2: Katelyn (circled in red) and Travis (circled in yellow) reaching down to help pull rioters up to the Northwest Terrace*

At approximately 2:24 p.m., the Bartows entered the Senate Wing Door, which other rioters had first breached 11 minutes earlier. At that time, rioters would have heard alarms blaring, and would have seen broken glass on the floor. Once inside the Capitol, the pair moved towards a hallway that leads towards the Capitol Visitor Center ("CVC"). Shortly before the Bartows arrived at that hallway, rioters violently blocked a large metal top-rolling door from shutting. This door separated the rioters from the CVC and a group of police officers. After successfully doing so, rioters assaulted officers with nearby objects and chased them into the CVC. Figure 3.



*Figure 3: Rioter throwing a trash can at an officer at approximately 2:29 p.m.*

After the police line collapsed, rioters pursued the officers into the CVC. The Bartows arrived moments later to join the rioters. Figure 4. The Bartows, however, paused for a few minutes in this hallway to direct other rioters to pick up trash. Katelyn then recorded a video of this scene and posted it with the caption, "And yes, this is moments after the storming of the Capitol." Figure 5.



*Figure 4: Katelyn (red) and Travis (yellow) move forward, arriving in the CVC approximately 14 seconds after the front line of rioters there.*



*Figure 5: Still image of a video posted to Katelyn's TikTok account*

After descending a staircase into the CVC, Travis turned back towards the stairs and waved more rioters forward. Figure 6. The Bartows then went down another hallway and joined a group of rioters confronting some police officers. As the officers tried to clear the area of the rioters, a fight broke out between rioters and police, which Katelyn later described as a brawl. Rather than leaving, however, the Bartows decided to stand between the rioters and the officers in order to, in Katelyn's words, "organize" the rioters. Figure 7. Eventually, after police ordered them to leave the building, the Bartows left the CVC and returned to the Senate Wing Door. There, they found a large group of rioters who were being corralled out of the Capitol by police officers. Figure 8. The Bartows stayed in this area for approximately five minutes, despite having been ordered by police to leave the building and despite their proximity to the exit. While waiting, Katelyn joined the crowd in a chant of "USA" before the she and Travis climbed out the nearby window at 2:54 p.m. Gov't Ex. 3 at 0:04. The Bartows were inside the Capitol for about half an hour.



*Figure 6: Travis (circled in yellow) waving other rioters into the CVC.*



*Figure 7: Katelyn (circled in red) "organizing" rioters while officers attempt to remove them.*



*Figure 8: Bartow and Travis (both circled in red) stand in the back corner of the lobby.*

After leaving Washington, D.C., on January 10, 2021, Katelyn drafted a message on her phone for Travis.[2] In the message, she stated, "I was honored to be [at the Capitol] by you and I was proud to be there with you, working side by side and rising up for what we believe in. . . . This is not the end. This is only the beginning." Katelyn also described the riot as an "incredible day." In addition to this Note, Katelyn had a seven-minute slideshow video on her phone primarily of the photographs and video clips she captured during the day. Gov't Ex. 10. The video is dubbed

---

[2] The FBI located this message in the "Notes" application on Katelyn's phone, so it is not clear if Katelyn actually sent the message to Travis. However, the draft message begins with "Dear Trav."

7

over with music urging the listener to fight and includes an image of lawmakers cowering in the House of Representatives gallery followed by a clip of Katelyn lauding the "storming of the Capitol." *Id.* at 5:07-5:17.

*Katelyn Bartow's Social Media*

In the days and weeks after January 6, Katelyn prolifically used social media to discuss the riot. The general tone of her communications was celebratory and defiant. In one photograph uploaded to Facebook, she is sitting on top of her brother's shoulders, cheering with an American flag draped over her shoulders. Figure 9. In another, since-deleted post, she published a photograph of herself standing above the inaugural stage, which was flooded with rioters. *See* Gov't Ex. 4. The photograph was captioned with the message: "It is better to die fighting for freedom than to live as a slave. It is better to die a prison fighting for what is right than to die a follower of the enslaver." Figure 10.



*Figure 9*          *Figure 10*

8

In several voice messages and videos, she reiterated how she and Travis "stormed" the Capitol and said that the day was "out of control." *See, e.g.*, Gov't Ex. 9 at 0:03-0:14. She also described how she was tear gassed, "but [the gas] really wasn't that bad." *Id.* at 0:26-0:28. In another video, Katelyn appears to be filming a news program from her hotel room. Gov't Ex. 5. During the short clip, Katelyn is audibly gleeful as the news program shows a video of her trying to help rioters up the wall to the terrace. *Id.* This amused tone continues in another voice message when she laughs after recounting how "shit started to go down . . . outside of the Capitol." Gov't Ex. 6. Finally, at the end of yet another voice message, Katelyn laughed while saying the riot "was sick. It was freaking badass." Gov't Ex. 7 at 0:47-0:53.

On another Facebook voice message, Katelyn discussed her motivations for going to the Capitol. Gov't Ex. 8. In the message, she said "it's time to fight back, like, we are going straight up Haiti on these ass wipes . . . yes, even the climbing, breaking into shit, like, I'm Haitian bitch, I'm in." *Id.*[3]

*Katelyn Bartow's Interview*

On February 9, 2021, Katelyn was interviewed by the FBI. During the interview, Katelyn confirmed that she traveled to Washington, D.C. on January 5, but she initially lied and said that she traveled to D.C. alone. Katelyn also said that she didn't see "things get out of control" while on the Capitol grounds. Rather, she described the area outside of the Senate Wing Door as "pretty in control." Katelyn claimed that once she entered the Capitol, she "wanted things to not get out of control."

---

[3] Although Katelyn does not directly make this connection, based on the tone of the message, the government understands Katelyn's reference to Haiti to mean the numerous *coups d'état* that the country has suffered during its history.

9

The interviewing agents then showed Katelyn some videos from her TikTok account. Katelyn said that she did not know anyone captured in the videos, even though Travis is clearly visible in both videos. Figures 11-12. After the agents showed Katelyn another video where she called someone "Trav," she confirmed that she had a brother Travis and changed her story to say that she went to Washington, D.C. with a small group of people. When pressed about Travis, Bartow said she was not comfortable discussing who she was with during the riot and that she would have to lie if the agents continued to ask.

 

*Figures 11 and 12: Travis is visible wearing an olive green jacket and blue face covering.*

*Travis Bartow's Interview*

On January 6, 2022, Travis was interviewed by the FBI. During the interview, Travis in large part accurately recounted his actions during the riot. However, he omitted details related to him encouraging rioters and helping them scale the wall onto the Northwest Terrace. In addition, Travis, like Katelyn, initially said that he did not go with anyone to the Capitol. But after the

10

interviewing agents confirmed that they had already spoken to Katelyn, Travis admitted that Katelyn was with him in Washington, D.C.

*The Charges and Plea Agreement*

On November 4, 2022, the United States charged the Bartows by a four-count Information with violating 18 U.S.C. § 1752(a)(1) and (2) and 40 U.S.C. § 5104(e)(2)(D) and (G). On July 20, 2023, pursuant to plea agreements, the Bartows each pleaded guilty to Count Four of the Information, charging them with parading, demonstrating, or picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G). By their plea agreement, the Bartows each agreed to pay $500 in restitution to the Architect of the Capitol.

### III.    Statutory Penalties

The Bartows now face a sentencing for violating 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, the defendants face up to six months of imprisonment and a fine of up to $5,000. The defendants must also pay restitution under the terms of her plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of 30 days' incarceration and $500 restitution.

#### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds

11

of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing the Bartows' participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for misdemeanor defendants like the Bartows, the absence of violent or destructive acts is not a mitigating factor. Had the Bartows engaged in such conduct, they would have faced additional criminal charges.

One of the most important factors in the Bartows' case is how central they tried to make themselves during the riot. After the violent breach of the West Front, they encouraged hesitant participants to continue moving forward and pulled other rioters up the wall to the Capitol's terrace. Once inside, Travis continued to encourage rioters through the Capitol as he and Katelyn followed closely behind rioters who had assaulted police officers. The Bartows then decided to "organize" the rioters after an altercation broke out. Even the fact that Katelyn rallied other rioters to pick up trash near the Capitol Visitor Center in order to film them doing so shows that Katelyn wanted to lead portions of the riot.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

### B. The Bartows' History and Characteristics

As set forth in the PSR, Katelyn Bartow has no criminal record beyond a single prior conviction for driving without a license in 2013. PSR ¶¶ 27-32. Katelyn, whose grandmother is from Haiti, reported spending time in Haiti as a child and on various occasions as a young adult, to help her grandmother's hometown and provide medical aid after an earthquake struck the country. PSR ¶¶ 38-39. While this work is laudable, it is ironic that Bartow invoked the image of

a Haitian insurrection as an inspiration for her to riot at the United States Capitol ("we are going straight up Haiti on these ass wipes"). Indeed, her experience in Haiti should have counseled against participating in the attempted insurrection on January 6 because she appears to know firsthand the lasting impact that *coups d'etat* can have on a country.

Travis also does not have a criminal record. PSR ¶ 24-29. He reported a good childhood, strong family relationships, and a good work history. Yet nothing in his background dissuaded him from participating in a riot at the United States Capitol. He too has spent a significant amount of time in Haiti, describing these trips as mission trips. PSR ¶ 36. If Travis points to these trips as a mitigating factor in sentencing, the Court should view Travis's experience in Haiti in a similar manner to Katelyn's.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.")

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

To date, Katelyn has expressed no remorse for her actions on January 6. Despite participating in and witnessing several dramatic moments of the riot, Katelyn's tone in the hours and days afterwards was jovial. In her videos and Facebook voice messages, she laughs while talking about her actions during the day. She downplayed the fact that she was sprayed with a chemical irritant, likely by police officers. Even after she had several days to reflect upon what happened during the riot, she still described the day as "incredible." Indeed, the video on her phone promoting the need to fight celebrated the fact that lawmakers had to shelter in the House gallery as rioters attempted to breach the House chamber. These statements by Katelyn indicate she has little, if any, remorse for her conduct on January 6 and demonstrate a need for deterrence.

The need for specific deterrence is further underscored by the fact that she lied to the FBI, claiming that she did not see things get "out of control" while on the Capitol grounds, that the area outside of the Senate Wing Door was "pretty in control" and that once she entered the Capitol, she

"wanted things not to get out of control"; additionally, she lied when she told the FBI that she went to Washington, D.C. alone.

Travis has also demonstrated a need for specific deterrence. Although he did not celebrate his actions on social media, he still actively encouraged rioters up to and through the Capitol Building. He also lied to the FBI, though he quickly corrected himself when confronted with contrary evidence. To date, Travis has not expressed remorse.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[4] This Court must sentence the Bartows based on their own conduct and relevant characteristics, but should give substantial weight to the context of their unlawful conduct: their participation in the January 6 riot.

The Bartows pleaded guilty to Count Four of the Information, charging them with Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. § 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar

---

[4] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), do apply, however.

Although the defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Joshua Dressel*, 21-cr-572 (CRC), the defendant observed rioters engage with police on the west front of the Capitol. After the police line in front of the inaugural scaffolding fell, Dressel climbed on top of one of the walls adjacent to the stairs leading to the Northwest Terrace and encouraged rioters to move forward. He entered the Senate Wing Door only two minutes after its initial breach, and proceeded to the Crypt where another clash with police officers occurred. After the riot, he deleted videos of the day from his phone and Facebook account. When interviewed by the FBI, Dressel minimized his actions, but he did not lie to the interviewing agents. The court sentenced Dressel to 14 days' incarceration.

Like Dressel, the Bartows encouraged rioters before entering the Capitol Building. The Bartows, however, went beyond verbally encouraging other rioters to physically assisting them, helping rioters to scale the wall leading to the Northwest Terrace. Once inside the Capitol, the Bartows continued to act as leaders throughout their time in the building, trying to organize rioters in the Capitol Visitors Center. Both Katelyn and Dressel had social media accounts where they celebrated their actions. The Bartows also both minimized their actions when interviewed by the FBI, but unlike Dressel, the Bartows outright lied to the FBI. Both Travis and Katelyn corrected themselves when confronted with contrary evidence, but Katelyn never identified Travis in her

16

TikTok video. Therefore, a sentence higher than the one imposed in *Dressel* is warranted for both Travis and Katelyn.

In *United States v. Jodi Wilson*, 22-cr-243 (CKK), Wilson observed rioters overrun officers on the East Front. When she reached another line of officers, Wilson tried to rally other rioters to join her. Wilson and other rioters also moved a portion of a bicycle rack barricade in order to create a path for the rioters to get to the Capitol Building. Wilson entered the Capitol through the breach at the Columbus Doors. Once inside the Rotunda, she filmed videos of the riot and posted them to her Facebook account. When interviewed by the FBI, she initially lied and said that she didn't enter the Capitol. When confronted with still images of her inside the Capitol, she claimed that officers gave her permission to enter. The court sentenced Wilson to 20 days' incarceration. Katelyn's conduct was similar to Wilson's 's and Travis's was slightly less so.

In *United States v. Marilyn Fassell*, 21-cr-692 (CKK), Fassell encouraged other rioters to proceed towards the Capitol. She celebrated the fact that rioters overwhelmed the police, shouting about how they had broken into the Capitol. She entered the Capitol through the Senate Wing Doors at 2:25 and stayed inside for 40 minutes. While inside, she entered then Speaker of the House Nancy Pelosi's office suite and the hideaway office of Senator Merkley. She showed no remorse when talking to the media following her arrest. The court sentenced Fassell to 30 days' incarceration. While Katelyn Bartow did not enter any sensitive spaces, she did assist other riots in scaling the wall, encouraged them forward and attempted to organize them inside the Capital Visitors Center. After the riot, she made repeated celebratory posts to her social media, and she lied to the FBI when interviewed. A 30-day sentence is warranted for Katelyn.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is

"firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

V.     **Restitution**

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[5] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to

---

[5] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

18

impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Katelyn and Travis must each pay $500 in restitution, which reflects in part the role that each played in the riot on January 6.[6] Plea Agreement at ¶ 11. As the plea agreements reflect, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023." *Id.* (As noted above in footnote 1, the amount of damages has since been updated by the Architect of the Capitol, USCP, and MPD.) The restitution payments must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 78.

## VI. Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Katelyn to 30 days' incarceration and Travis to 21 days' incarceration, and order each defendant to pay $500 restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on the Bartows' liberty as a consequence of their behavior, while recognizing their acceptance of responsibility for their crime.

---

[6] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

                Respectfully submitted,

                MATTHEW M. GRAVES
                United States Attorney
                D.C. Bar No. 481052

By:    */s/ Andrew Haag*
                Andrew S. Haag
                Assistant United States Attorney
                MA Bar Number 705425
                601 D Street NW
                Washington, D.C. 20530
                (202) 252-7755
                andrew.haag@usdoj.gov